1

**BURSOR & FISHER, P.A.**

2

L. Timothy Fisher (State Bar No. 191626)

Joshua R. Wilner (State Bar No. 353949)

3

1990 North California Blvd., 9th Floor

Walnut Creek, CA 94596

4

Telephone: (925) 300-4455

Facsimile: (925) 407-2700

5

E-mail: ltfisher@bursor.com

jwilner@bursor.com

6

7

*Attorneys for Plaintiff*

8

9

10

11

### UNITED STATES DISTRICT COURT

12

### NORTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| SCARLETT MOSHER, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| UNIGO LLC, | <u>JURY TRIAL DEMANDED</u> |
| Defendant. | |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

PAGE(S)

NATURE OF THE ACTION ................................................................................1

PARTIES ..........................................................................................................3

JURISDICTION AND VENUE ..........................................................................3

FACTUAL ALLEGATIONS ..............................................................................3

I.      OVERVIEW OF THE THIRD PARTIES ................................................3

        A.      Google Ad Manager ....................................................................3

        B.      HubSpot Forms ............................................................................5

II.     THE THIRD PARTIES—AS PROCURED BY DEFENDANT—
        INTERCEPT AND ACQUIRE USERS' PERSONALLY IDENTIFYING
        INFORMATION AND WEBSITE COMMUNICATIONS .........................7

III.    PLAINTIFF'S EXPERIENCE ..............................................................12

IV.     DEFENDANT PROCURED OR OTHERWISE ENABLED THE THIRD
        PARTIES' WIRETAPPING OF PLAINTIFF'S ELECTRONIC
        COMMUNICATIONS FOR ADVERTISING, MARKETING, AND DATA
        ANALYTICS PURPOSES....................................................................14

CLASS ALLEGATIONS ..................................................................................15

COUNT I ........................................................................................................16

COUNT II ......................................................................................................19

PRAYER FOR RELIEF ...................................................................................21

JURY TRIAL DEMANDED .............................................................................22

Plaintiff Scarlett Mosher ("Plaintiff") bring this action on behalf of herself and all others similarly situated against Unigo LLC ("Unigo" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Unigo for aiding, agreeing with, employing, procuring, or otherwise enabling the wiretapping of the electronic communications of visitors to its website, unigo.com (the "Website").

2. Specifically, Defendant aids, agrees with, procures, or otherwise enables at least two third-party service providers to collect information from visitors to its Website: Alphabet, Inc. ("Google") and HubSpot, Inc. ("HubSpot") (collectively, the "Third Parties").

3. These Third Parties—as enabled by Defendant—eavesdrop on the information provided by Website visitors in the form fields, search bars, and scholarship applications. These Third Parties conduct the wiretapping through two pieces of software-as-a-service ("SaaS"): Google Ad Manager f/k/a DoubleClick ("GAM"), provided by Google, and HubSpot Forms, provided by HubSpot (collectively the "Services").

4. The Services each consist of software development kits ("SDK") and application programming interfaces ("API"). SDKs are "set[s] of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[1]

5. An API is a piece of technology that can be installed onto a website to "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[2]

---

[1] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[2] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

6.      Through the Services, the electronic communications are contemporaneously acquired (*i.e.*, collected in real time) and used by the Third Parties to, among other things, assist Defendant with its marketing, advertising, and data analytics efforts.

7.      The nature of the Third Parties' licensing agreements with Defendant are such that Defendant "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, to learn, and/or to use the confidential communications of Website visitors without prior consent, thus violating the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §2511(1) and the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a).

8.      As a result of its partnership with Defendant, Google—as procured by Defendant—acquires via GAM a users': (i) birthdate, (ii) gender, (iii) city, state, zip code, (iv) preferred college, (v) SAT scores, (vi) type of school level, (vii) major choices, and (viii) a Google Analytics ID.

9.      As a result of its partnership with Defendant, Hubspot—as procured by Defendant—acquires via Hubspot Forms a users': (i) full name, (ii) gender, (iii) email address, (iv) phone number, (v) street address, (vi) date of birth, (vii) high school graduation year, (viii) GPA, (ix) highest education level reached (x) parent's full name, (xi) parent's email address, and (xii) a unique user ID given to each user.

| THIRD PARTY | WIRETAPPING INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Hubspot Forms** | Grad Year, GPA | Address, Birthdate, City, Email, Full Name, Phone Number | Parent's Email, Parent's Phone Number, User ID |
| **Doubleclick (Google)** | Preferred College, SAT Results, School Level, Major Choices, First Generation Student | Birthdate, Gender, Zip Code, City | - |

10.     Plaintiff brings this action on behalf of all United States residents who entered information into the Website while in the United States, and whose electronic communications were intercepted or recorded by the Third Parties.

**PARTIES**

11.     Plaintiff Scarlett Mosher is a California citizen who resides in Orinda, California. Plaintiff Mosher was in California when she visited the Website and entered information into the Website.

12.     Defendant Unigo, LLC is a Wyoming limited liability company with its principal place of business at 30 N. Gould St. # 37326, Sheridan, Wyoming 82801.  Defendant owns and operates the Website.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

14.     This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this district by offering its services to residents of this District, including by providing information and applications for scholarships to students attending colleges in this District, "matching" students to colleges in this District, maintaining a database of student reviews of colleges in this District, and providing access to student loans for students in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff Mosher resides in this District.

**FACTUAL ALLEGATIONS**

**I.      OVERVIEW OF THE THIRD PARTIES**

**A.      Google Ad Manager**

16.     Google Ad Manager, formerly known as DoubleClick, "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[3]

---

[3] DoubleClick Digital Marketing, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

17.     DoubleClick was acquired by Google in 2008.  In 2018, DoubleClick was integrated with the Google Analytics API into the Google Marketing Platform.[4]  The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names.  For example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and "DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[5]

18.     Once integrated into a developer's mobile application, GAM allows a website developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[6]

19.     When GAM is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, GAM involves Google, a separate and distinct third-party entity from the parties in the conversation, using GAM to eavesdrop on, record, extract information from, and analyze an online conversation to which it is not a party.  This is so because Google itself is collecting the content of any conversation in real time and viewing each and every piece of information collected.  That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).

20.     Once Google intercepts the Website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[7]

---

[4] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google//products/marketingplatform/360/introducing-google-marketing-platform/.

[5] Introducing Google Marketing Platform, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

[6] DoubleClick Digital Marketing, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

[7] Privacy And Terms, GOOGLE, https://policies.google.com/technologies/partner-sites.

21.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

22.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

23.    In sum, Google has the capability to use website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with and data analytics and targeted advertising.

24.    Google views and processes every piece of information collected from GAM, including the information collected from the Website, and uses it to assist with data analytics, marketing, and targeted advertising.

25.    One of Google's partners is Defendant.  GAM is employed on the Website in the manner described throughout this Complaint.

**B.    HubSpot Forms**

26.    HubSpot Forms is a service that can be installed on a webpage to capture information entered into forms on a website and "pass any information captured on your website or application to HubSpot, including custom data,"[8] so as to "turn anonymous website visitors in to qualified leads" for targeted marketing campaigns.[9]

---

[8] Forms Overview, HUBSPOT, https://legacydocs.hubspot.com/docs/methods/forms/forms_overview.

[9] Free Online Form Builder, HUBSPOT, https://www.hubspot.com/products/marketing/forms?hubs_content=knowledge.hubspot.com%2Fforms%2Fcreate-forms&hubs_content-cta=easily%2Fcreate%2Fforms.

27.    The information captured by HubSpot Forms is automatically processed by HubSpot and added to datasets that can be linked with targeted marketing and real-time bidding advertising campaigns, like Salesforce and Google Ads.[10]

28.    HubSpot collects this information to create profiles of consumers to add to demographic lists, which are groups of consumers that are categorized based on specific characteristics for the purpose of targeting them with hyper-specific advertising.  These audiences can be plugged into the advertising platforms of Meta, Google, and other advertisers to assist in HubSpot's customers' marketing efforts.[11]

29.    When HubSpot Forms is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, Hubspot Forms involves HubSpot, a separate and distinct third-party entity from the parties in the conversation, using Hubspot Forms to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because HubSpot itself is collecting the content of any conversation in real time and viewing each and every piece of information collected.  That information is then analyzed by HubSpot before being provided to any entity that was a party to the conversation (like Defendant).

30.    Once HubSpot intercepts the Website communications, it has the ability to use such information for its own purposes.  HubSpot's services are based on HubSpot's ability to collect and analyze consumer's web behavior and deliver that information to present and future customers (*i.e.*, to collect information from one customer's users and disclose that same information to other customers), who use that information for targeted advertising and product optimization.  HubSpot must constantly improve its ability to create custom audiences to compete with other data management and CRM platforms in the competitive targeted advertising and real-time bidding markets.  This optimization is done by collecting and analyzing information, like that collected from Plaintiff and Class Members.

---

[10] Associate Forms With Salesforce Campaigns, HUBSPOT, https://knowledge.hubspot.com/forms/how-do-i-associate-a-form-with-a-salesforce-campaign?hubs_content=knowledge.hubspot.com/marketing-tools/topics&hubs_content-cta=uiLinkDark.

[11] Create And Sync Ad Conversion Events With Your Google Ads Account, GOOGLE, https://mail.google.com/mail/u/0/#chat/dm/7C4WH4AAAAE?compose=CllgCHrdkvBLRwCvBcl TkzblPVvtjXgLCVnpFXbgLSPDgJhcvtRqfzNdhWfbftwbWqNnBsHkVNB.

31.     Information from websites, like Defendant's Website, is central to HubSpot's ability to successfully market their advertising capabilities to future clients.

32.     In sum, HubSpot has the capability to use website communications to: (i) improve its own products and services; (ii) develop new products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

33.     Hubspot views and processes every piece of information collected from HubSpot forms, including the information collected from the Website, and uses it to assist with data analytics and targeted advertising.

34.     One of HubSpot's partners is Defendant.  HubSpot Forms is employed on the Website in the manner described throughout this Complaint.

## II.    THE THIRD PARTIES—AS PROCURED BY DEFENDANT—INTERCEPT AND ACQUIRE USERS' PERSONALLY IDENTIFYING INFORMATION AND WEBSITE COMMUNICATIONS

35.     Defendant markets itself as "the premier network for current and future college students to get to where they're going."[12]  The Website provides information to prospective students about colleges and college scholarships across the United States, including in the Commonwealth of Pennsylvania.

36.     Because the Website targets "current and future college students," its users are typically on the younger end, and may even be minors.

37.     To view and apply for the scholarships offered on the site, website visitors must create a free account.  As displayed below, when creating the account, users are prompted to enter their full name, education level (expressed as the year graduating high school or college), gender, GPA, and address.

---

[12] About, UNIGO, https://www.unigo.com/aboutus.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   38.   When applying for scholarships, college matching, and other services, users are

16 prompted to enter additional personal information, including the users' preferred colleges, SAT

17 results, major, grade point average ("GPA"), and other demographic information, such as whether

18 the user is a first-generation college student.  The following screenshots are illustrative:

19
20
21
22
23
24
25
26
27
28







39.     As indicated above, the aforementioned information is not statically collected by the Website, but is instead actively and affirmatively entered by users on the Website.

40.     In May 2024, Plaintiff's counsel retained a private research company to review the Apps and conduct a dynamic analysis. A "dynamic analysis" records the transmissions that occur from a user's device.

41.     The private researchers tested what information (if any) was disclosed when a user creates an account and accesses the services offered on the Website. The analysis revealed that the Services were installed on the Website and that the Third Parties, through the Services and as procured by Defendant, intercepted and acquired Website users' personally identifying information ("PII") and the contents of their communications with Defendant.

42.     When a user visits the Website and communications with Defendant (*i.e.*, enters information into the form fields), Google—as procured by Defendant—acquires via GAM a users': (i) birthdate, (ii) gender, (iii) city, state, zip code, (iv) preferred college, (v) SAT scores, (vi) type of school level, (vii) major choices, and (viii) a Google Analytics ID:

43.     Similarly, when a user visits the Website and communications with Defendant (*i.e.*, enters information into the form fields), Hubspot—as procured by Defendant—acquires via Hubspot Forms a users': (i) full name, (ii) gender, (iii) email address, (iv) phone number, (v) street address, (vi) date of birth, (vii) high school graduation year, (viii) GPA, (ix) highest education level reached (x) parent's full name, (xi) parent's email address, and (xii) a unique user ID given to each user:

We observed **HubSpot Forms** obtaining:

**Wiretapping Information** in the form of:
- High School Grad Year
- GPA

**Personal Information** in the form of:
- Address
- Birthdate
- City
- Email
- Full Name
- Phone Number
- Zip Code

**Other Information** such as:
- Parent's Email
- Parent's Phone Number
- Pseudonym UserID

https://**forms.hscollectedforms.net**/collected-forms/submit/form
PostData PARAM:
email: prairie8370gmail.com
firstName: Patricia
lastName: Santiago
phone: 9172792570
formSelectorClasses: .student-form
formSelectorId: #student-form
My High School Grad Year: 2025

My Birthdate: 2006-08-02
GPA: 3.7
Address: 888 Boylston Street
City: Boston
Zip: 02199
Parent First Name: Roberto
Parent Last Name: Sanchez
Parent Email: beegoodkay@gmail.com
Student Phone: 9172792550
My Education Level: High School Junior (class of 2025)
Gender: Female
State: Massachusetts

portalId: 19665128
type: SCRAPED
utk: 70d5a855fae112f84d3122a6132157ac
uuid: f424f7b9-9f77-420a-a7e9-d51a40fa2652
version: collected-forms-embed-js-static-1.491
collectedFormId: student-form
collectedFormClasses: student-form
collectedFormAction: https://www.unigo.com/wp-login.php?action=register

44.    Notably, both of the Third Parties assign an independent identifier to each unique Website user: Google assigns each Website user a unique Google Analytics ID and HubSpot assigns each Website user a unique "UUID." Based on the information already disclosed to the Third Parties, the Third Parties have backend tools to connect a Website user with a unique Google Analytics ID and/or HubSpot UUID. These unique identifiers serve as an additional layer to help categorize Website users and amass their information into a cohesive user profile, thereby furthering Defendant's marketing, analytics, and advertising (and the services that the Third Parties can provide to other customers).

45.    Since at least May 2023, if not earlier, Defendant employed the services of the Third Parties and their APIs on each page of the Website to track users' communications and send those communications to the Third Parties so the Third Parties can analyze the information and enable Defendant to target users with ads based on those answers.

46.    Neither Defendant nor the Third Parties obtain Website users' consent to the wiretapping prior to a user inputting information into the Website.

**III.    PLAINTIFF'S EXPERIENCE**

47.    In or about June 2020, Plaintiff Scarlett Mosher visited the Website and created a Unigo account.

48.     When creating her account, Plaintiff Mosher entered her name, address, birthdate, gender, education level, high school, grade point average, SAT score, desired major, scholarship interests, and other personal information into the Website.

49.     Plaintiff Mosher continued to access the Website, including to enter more personal information into Unigo's "Scholarship Match" page.  Plaintiff Mosher accessed the Website as recently as July 21, 2024.

50.     As Plaintiff Mosher entered this information into the pages of the Website (*i.e.*, in real time), the Third Parties—as aided, agreed with, employed, and procured by Defendant—wiretapped Plaintiff Mosher's communications with Defendant.

51.     The Third Parties viewed and processed each and every one of Plaintiff Mosher's communications with Defendant's website and used the information for data analytics and targeted advertising.

52.     The Third Parties' recording of electronic communications begins the moment a user accesses or interacts with Defendant's Website, prior to a user consenting to any sort of privacy policy or the APIs generally.  Nor are users told, prior to being wiretapped, that their electronic communications are being simultaneously directed to HubSpot and Google, rather than only to Unigo.

53.     Plaintiff Mosher was thus not on notice of any wiretapping when she began answering questions on Defendant's Website, nor did she provide prior consent to the same.

54.     Plaintiff Mosher was in California when she accessed Defendant's website through an internet browser and entered personal information into Defendant's Website.  Upon having the browser access the Website in California, the APIs each instructed the browser in California to send the electronic communications directly to the respective Third Parties' servers.

55.     HubSpot and Google had access to Plaintiff's and Class Members' communications and personal information entered on Defendant's Website because each company contracts with Unigo to hide the respective APIs in the Website.

56.     Plaintiff Mosher did not discover that her communications had been wiretapped until July 2024.

**IV.   DEFENDANT PROCURED OR OTHERWISE ENABLED THE THIRD PARTIES'
WIRETAPPING OF PLAINTIFF'S ELECTRONIC COMMUNICATIONS FOR
ADVERTISING, MARKETING, AND DATA ANALYTICS PURPOSES**

57.   As described above, Google and HubSpot collect information from visitors' interactions with Defendant's Website via GAM and HubSpot Forms respectively.

58.   The purpose of this invasion of privacy is straightforward: the Third Parties collect information from Defendant's website and send back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

59.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns, enabling the Third Parties and Defendant to "track [] online behavior … and use that data to make informed decisions about how to reach new and existing customers"[13] through advertisements.

60.   In addition to helping companies like Defendant make better use of Website user information, Google aggregates that information with the information collected from all sites containing GAM or other Google services to track users across multiple websites and platforms, which increases the value of its advertising services when they are offered to other companies.

61.   Likewise, Hubspot aggregates that information with the information collected from all sites containing the HubSpot Forms to track users across multiple websites and platforms, which increases the value of its advertising services when they are offered to other companies.

62.   Thus, the agreement for Defendant to procure the Third Parties' wiretapping of Plaintiff and Class Members' communications increases the advertising efficiency and, by extension, the profits of Defendant and the Third Parties alike.

63.   Neither Third Party recorded the information for the sole benefit of Defendant. Instead, each Third Party used (or had the capability to use) the information obtained from Website users for their own benefit and viewed and processed the information obtained for that purpose.

---

[13] The Value of Digital Analytics, GOOGLE, https://support.google.com/analytics/answer/12159453?hl=en&ref_topic=14089939&sjid=13981060670687488151-NC.

64. In sum, Google and HubSpot each generate their own revenue by collecting internet activity and using that information for targeted advertising. They each used the information collected by the Services to analyze marketing campaigns, conduct targeted advertising, and ultimately boost their own advertising revenue.

## CLASS ALLEGATIONS

65. Plaintiff seeks to represent a class of all United States residents who entered information into the Website while in the United States during the statute of limitations period (the "Class").

66. Plaintiff also seeks to represent a subclass of all California residents who entered information into the Website while in the United States during the statute of limitations period (the "California Subclass").

67. Excluded from the Class are: (i) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (ii) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (iii) the judge(s) assigned to this case and any members of their immediate families.

68. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of members of the Class and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

69. There is a well-defined community of interest in the common questions of law and fact affecting Class members. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Common legal and factual questions include, but are not limited to, whether Defendant has violated the CIPA and whether members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

70.     The claims of the named Plaintiff are typical of the claims of the Class because the Plaintiff, like all other class members, visited Defendant's website and had her electronic communications intercepted and disclosed to Google and Hubspot through the use of the APIs.

71.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

72.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

73.     Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

### COUNT I
**Violation of ECPA**
**18 U.S.C. § 2511(1), *et seq.***

74.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

75.     Plaintiff brings this claim against Defendant individually and on behalf of the Class.

76.     The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

77.     The ECPA protects both sending and receiving communications.

78.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

79.     The transmission of Plaintiff's personally identifying information ("PII") and confidential communications with Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

80.     The transmission of PII and communications between Plaintiff and Class members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

81.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

82.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

83.     The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

84.     The following instruments constitute "devices" within the meaning of the ECPA:

a)      The computer codes and programs Defendant and Third Parties used to track Plaintiff and Class members communications while they were navigating the Website;

b)      Plaintiff's and Class members' browsers;

c)      Plaintiff's and Class members' mobile devices;

d)      Defendant and Third Parties' web and ad servers;

e)    The plan Defendant and Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

85.    Plaintiff and Class members' interactions with Defendant's Website are electronic communications under the ECPA.

86.    By utilizing and embedding the tracking technology provided by Third Parties on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

87.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class members' electronic communications via the tracking technology provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to Third Parties.

88.    Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their identities and information related to their personal and familial medical histories.  This confidential information is then monetized for targeted advertising purposes, among other things.

89.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

90.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

91.    Defendant intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

92.     The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. As alleged herein, Defendant violated the California Invasion of Privacy Act. A provision of the California Penal Code preventing the interception of confidential communications without consent.

93.     Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

94.     Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy.  Plaintiff and Class members had a reasonable expectation that Defendant would not redirect their communications to Third Parties without their knowledge or consent.

95.     The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

96.     As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

<u>COUNT II</u>
**Violation of CIPA**
**Cal. Pen. Code § 631**

97.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

98.     Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

99.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including

the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

100.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier*, 2022 WL 1744107, at *1 ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

101.    The APIs are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

102.    Google and HubSpot are each a "separate legal entity that offer[] [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, each Third Party had the capability to use the wiretapped information for its own purposes. Accordingly, Google and HubSpot were each a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

103.    At all relevant times, by using the APIs, Google and HubSpot willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

104.    At all relevant times, Google and HubSpot used or attempted to use the communications intercepted by their APIs to improve their products and services, track and advertise to internet users across websites, and generate revenue for themselves and their clients.

105.    At all relevant times, Defendant aided, agreed with, employed, or otherwise enabled the Third Parties to wiretap consumers to the Website using the APIs and to accomplish the wrongful conduct at issue here.

106.    Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, or otherwise enabling the Third Parties' conduct.

107.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff and Class Members' electronic communications to each Third Parties' respective servers.

108.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.  For an order certifying the Class under Rule 23, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

b.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.  For judgment in favor of Plaintiff and the Class on all counts asserted herein;

d.  For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded; and

f.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  May 1, 2025

**BURSOR & FISHER, P.A**.

By:   */s/ L. Timothy Fisher*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          jwilner@bursor.com

*Attorneys for Plaintiff*